```
 1                IN THE UNITED STATES DISTRICT COURT

 2              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

 3   UNITED STATES OF AMERICA,        )
                                      )  No. 3:23-CR-1291-TWR
 4            Plaintiff,              )
                                      )
 5   v.                               )  July 11, 2023
                                      )
 6   LEONARD DARNELL GEORGE,          )
                                      )  Courtroom 3D
 7            Defendant.              )
     _____)  San Diego, California
 8

 9           TRANSCRIPT OF DIGITALLY RECORDED PROCEEDINGS

10         (Detention Hearing and Status Hearing Re Counsel)

11      BEFORE THE HONORABLE BARBARA LYNN MAJOR, MAGISTRATE JUDGE

12

13   APPEARANCES:
     FOR THE PLAINTIFF:        BIANCA CALDERON-PENALOZA
14                             Assistant U.S. Attorney
                               U.S. Attorney's Office
15                             Southern District of California
                               880 Front Street, Room 6293
16                             San Diego, CA  92101-8893
                               (619)557-8573
17

18   FOR THE DEFENDANT:        ANDREW NIETOR
                               The Law Office of Andrew Nietor
19                             750 B Street, Suite 2330
                               San Diego, CA  92101
20                             (619)794-2386

21

22
     COURT REPORTER:           AMANDA M. LeGORE
23                             RDR, CRR, CRC, FCRR, CACSR
                               U.S. District Court
24                             333 West Broadway, Suite 420
                               San Diego, CA 92101
25                             amanda_legore@casd.uscourts.gov
```

```
 1                (Tuesday, July 11, 2023; 10:00 a.m.)
 2
 3                      P R O C E E D I N G S
 4
 5            THE CLERK:  Matter 8, 23-CR-1291-TWR, U.S.A. v.
 6   Leonard Darnell George.
 7            ATTORNEY NIETOR:  Good morning, your Honor.  Andrew
 8   Nietor on behalf of Mr. George, who is present, in custody.
 9            THE COURT:  All right.  Thank you.
10            ATTORNEY CALDERON-PENALOZA:  Good morning, your
11   Honor.  Bianca Calderon-Penaloza for the United States.
12            THE COURT:  All right.  So we had two issues.  The
13   first one is the status of counsel.
14            Have you hired a lawyer?
15            THE DEFENDANT:  (Indiscernible due to not speaking
16   into microphone) the only thing I have (indiscernible) I was,
17   uh -- (indiscernible) and (indiscernible) attorney
18   (indiscernible) very hard.
19            THE COURT:  But that's the way it works.  You have
20   the ability to hire a lawyer, and I told you you have to do
21   that.
22            Other defendants are able to do it from prison.  You
23   have that same capability.
24            THE DEFENDANT:  (Indiscernible) so --
25            THE COURT:  I'm sorry?  I couldn't hear.
```

1              THE DEFENDANT:  (Indiscernible.)
2              THE COURT:  The phones work.  That's how you do it.
3         All right.  So Mr. Nietor provisionally represented
4    you through this hearing.  We'll go forward on this hearing.
5              But after that, if you don't have a lawyer, you've
6    got to hire somebody.
7              THE DEFENDANT:  Yes, ma'am.
8              ATTORNEY NIETOR:  Your Honor, could I speak to the
9    issue of the appointment?
10             THE COURT:  Sure.  Of course.
11             ATTORNEY NIETOR:  The other attorney did reach out to
12   me.  He was representing Mr. George in a matter unrelated to
13   this case.  He is not a criminal defense attorney, so he would
14   have no ability to do that.  It was related to an employment
15   matter of Mr. George.  Mr. George and his family actually still
16   owe that attorney money, so they're in debt to this attorney.
17             Beyond that, looking at this financial affidavit,
18   just to update the Court on some of the information, obviously
19   the income listed for Mr. George no longer is going to be
20   income.
21             THE COURT:  It was the assets.
22             ATTORNEY NIETOR:  Yes.  The vehicle.  But the main
23   asset was the vehicle, and that has been confiscated.  The
24   property --
25             THE COURT:  Come to sidebar.

```
 1              ATTORNEY NIETOR:  (Indiscernible.)
 2              THE COURT:  No, not the Government.
 3              ATTORNEY CALDERON-PENALOZA:  Understood, your Honor.
 4              (Pause, off-the-record sidebar discussion.)
 5              THE COURT:  All right.  Mr. George, I am -- I was
 6   remembering assets that belonged to a different defendant who
 7   came through this week.  That was my big concern.
 8              So I met with your lawyer.  When we talked about the
 9   information in the financial affidavit, he provided me some
10   additional updated information.
11              Based upon that information, I'm going to leave
12   Mr. Nietor provisionally appointed.
13              What that means is it still appears that you have the
14   ability to pay for his services.  And depending on what happens
15   in the case, you're required to do that.
16              Do you understand?
17              THE DEFENDANT:  Yes, ma'am.
18              THE COURT:  I mean, you are required to pay his --
19   pay his fees.  And if you get out of custody and get a job,
20   then I'll require you to start making payments immediately.
21   Otherwise, that will be a debt that's due later.
22              All right.  Mr. Nietor, so you are now the attorney
23   of record, although provisionally appointed.
24              Detention hearing.
25              Government?
```

 1            ATTORNEY CALDERON-PENALOZA:  Yes, your Honor.
 2            The United States is moving to detain based on the
 3   risk of flight and because the defendant poses a danger to
 4   himself.
 5            As to the nature and circumstances of the offense,
 6   your Honor, the defendant's arrest stems from a year-long
 7   investigation charging the defendant with bribery, conspiracy
 8   to import controlled substances, and conspiracy to distribute
 9   controlled substances.
10            The narcotics offenses, alone, carry a presumption of
11   detention and a mandatory minimum of ten years, if convicted.
12            The weight of the evidence, your Honor -- although
13   the least important factor here -- is strong.  Here, the
14   defendant was identified by previous load drivers, who
15   confirmed that they were instructed to drive through the
16   defendant's lane when he was assigned as a primary booth
17   inspector at the San Ysidro port of entry.
18            In one example, a series of vehicles loaded with
19   narcotics in Tijuana waited until they received a go signal
20   from the drug trafficking organization that the defendant --
21   otherwise known as The Goalie - was ready for the vehicles.
22   Port video evidence supports this.  And one of the vehicles
23   that was subsequently seized was carrying approximately 200
24   pounds of methamphetamine at the time.
25            Additionally, the defendant repeatedly lent his

1  registered vehicle to Gutierrez and Galvan, who were two known
2  members of the drug trafficking organization who are also
3  charged as co-conspirators.
4          Gutierrez and Galvan repeatedly drove through the
5  defendant's lane without proper inspection.  And video evidence
6  and TECS records also confirm this.
7          Financial records demonstrate that the defendant gave
8  large cash deposits to his account and large credit card
9  payments in cash during the suspected time period, without
10 verifiable sources of those cash payments.
11         As to the history and characteristics of the
12 defendant, your Honor, here he is a 41-year-old United States
13 citizen.  And although he has no prior criminal history and he
14 has been living in San Diego for the past 17 years, for the
15 last two to three years he was living -- he has been living a
16 secret life, apart from his wife and children; which
17 significantly minimizes his ties to the community.
18         According to the defendant's own wife, she and the
19 defendant were in the process of separating and divorcing
20 due -- due to his secretive behavior, his frequent trips to
21 Hong Kong, and the lack of financial transparency.  It is
22 unlikely that the defendant would be able to return with his
23 family or his residence.
24         The defendant's significant ties to Mexico are
25 also -- are also noted here.  His TECS records show that he was

1  consistently traveling to Mexico on his days off.  And in this
2  year, alone, the defendant has traveled to Mexico 39 times,
3  which -- on average -- is about once per week.  And in the week
4  that he was arrested, he traveled there twice, and indicated to
5  visiting a female friend who was employed at Hong Kong.
6          As to his employment, your Honor, although he was
7  previously employed, he can no longer return to his previous
8  place of employment given the charges that are alleged.  And it
9  would be unlikely that he would be able to secure comparable
10 employment.
11         As to the defendant's mental health, your Honor, the
12 Pretrial Services report notes that the defendant reported
13 experiencing an anxiety attack due to personal stress,
14 approximately two months ago.  However, he was not presently
15 experiencing symptoms when he was interviewed by Pretrial
16 Services.
17         The defendant mischaracterized this incident, your
18 Honor, which demonstrates an inability or unwillingness to
19 fully inform Pretrial Services and the Court as to his mental
20 state.
21         What the defendant falsely described as an anxiety
22 attack was actually much more serious, as the defendant was
23 suffering from suicidal ideations that resulted in a 5150 hold
24 as recently as May of this year.
25         The defendant's suicidal ideations prompted San Diego

1    Police Department to conduct a wellness check on the defendant,
2    where they subsequently seized his four registered firearms.
3               The defendant reported that he had been experiencing
4    ongoing stress at work and financial issues.  San Diego Police
5    Department also reported that the defendant had, since then,
6    repeatedly requested the return of those firearms.  This is
7    before the defendant became aware of the charges that he now
8    faces.  And he now faces a significant period of incarceration,
9    if convicted, which demonstrates that the risk of self-harm is
10   even greater.  And which poses an extreme danger to the
11   defendant's own well-being.
12              Despite the defendant's ties to this district, your
13   Honor, the United States does not believe that those ties are
14   sufficient to rebut the presumption of detention here.
15              The defendant's secret life, his mental health all
16   bear on the defendant's credibility; his willingness to keep
17   pretrial informed as to his current state of mind and also his
18   personal safety.
19              These factors, coupled with his ties to Mexico,
20   demonstrate there are no conditions or reasonable combination
21   of condition that would reasonably ensure the defendant's
22   future appearance at court proceedings.  And for those reasons,
23   your Honor, we do ask that the Court -- that the defendant be
24   detained without bond.
25              THE COURT:  All right.  Thank you.

1              Go ahead, sir.
2              ATTORNEY NIETOR:  Thank you, your Honor.
3              We're requesting a personal appearance bond in the
4    amount of $20,000, secured by one financially responsible and
5    related adult.
6              I would like to start by noting that last week the
7    initial recommendation of Pretrial Services was -- was similar
8    to that $20,000, with the 10 percent cash deposit.  Today they
9    actually lowered that to $10,000.  And I assume that's because
10   they've been able to verify some of the information that I'll
11   be discussing today.
12             Mr. George has significant family and community ties
13   in San Diego.  He and his wife, (indiscernible) have been
14   married for about 11 years.  She's in court today.  She's
15   sitting in the back.  If you would just raise your hand.
16             THE COURT:  Thanks for coming to support him.
17             ATTORNEY NIETOR:  So they've been married for about
18   11 years.  They've been together longer than that.  They live
19   with their three children, ages 15 and two five-year-old twins.
20             Their home -- they purchased their home about two
21   years ago.  It's in San Ysidro.  And they've been living in
22   that home since -- since then.  So they're homeowners.
23             Mr. George is originally from Louisiana, but he's
24   been in California for over 20 years.  He's been in San Diego
25   for about 17 years.  So he's made his life here, in our

1 community.

2 　　　　　He has a history of long-term employment.  At the
3 time of his arrest, he had been with the U.S. Customs and
4 Border Protection for about five years.  Before that, he
5 worked, again, in law enforcement as a correctional officer for
6 CoreCivic, here in San Diego, for a few years before that.  He
7 was a military contractor before that.

8 　　　　　He has traveled to Mexico before.  As many people in
9 San Diego, he would cross over for day trips.  He has no family
10 outside of the United States.  He has no significant ties
11 outside the United States.  He has acknowledged and is honest
12 that two or three times a month he does travel to Tijuana.  He
13 goes to clubs.  He goes to bars.  But, again, it's always
14 for -- for one day.

15 　　　　　He is in good health, although he does suffer from
16 anxiety.

17 　　　　　I very much disagree with the characterization that
18 he minimized his anxiety attack.  If anything, I think the
19 Government is greatly exaggerating it.

20 　　　　　He had an anxiety attack.  His wife called the
21 paramedics.  And he was taken to the hospital, and released the
22 same day.  His wife brought in the discharge papers today, and
23 they show that he was released without any medication
24 prescriptions.  He's never been on medication.  And the only
25 follow-up instructions were that he should contact a -- a

1   psychologist for a meeting within three to five days, and
2   there's been nothing since then.
3          So that -- I think that clearly indicates that he is
4   not a --
5          THE COURT:  Did he follow up with a psychiatrist?
6          ATTORNEY NIETOR:  I would have to check with him, to
7   see whether he's done that.  I don't know, your Honor.
8          But he certainly -- I've spoken to him about his
9   willingness to do that, and that is definitely a condition that
10  the Court could set and that Mr. George would be very willing
11  to follow up with any mental health counseling that the Court
12  does impose.
13         He did have legal registered firearms in the home.
14  They've been taken -- taken away.  And when he was requesting
15  those back, he was trying to get those legal registered
16  firearms back in a legal way.  And he certainly acknowledges
17  that most likely a reasonable condition would be that he no
18  longer pursue the return of those firearms into the home, and
19  he would certainly agree to that.
20         So very similar to the issue of mental health, the
21  issue of the firearms can be very easily and directly addressed
22  by reasonable conditions that the Court could set.
23         I'm also -- I have to say, I'm a bit troubled by the
24  idea that Mr. George's mental health issues, as minimal as they
25  are, are somehow a factor that weighs in favor of detention.  I

1  think that's very much against what's -- the statute would
2  hold.  And the conditions under which he is currently detained,
3  in a segregated special housing unit because of his prior
4  employment, are only going to make his mental health anxiety
5  issues worse.
6           He's also pled not guilty to this offense.  He plans
7  to pursue that.  And his ability to -- to meet with me and my
8  ability to consult with him is affected.  Because even the
9  first time I tried to go visit him, because he's in
10 segregation, my ability to -- to visit him whenever I liked to,
11 to review discovery, is greatly impacted because of where he's
12 housed.
13          And, again, the -- the offense and the weight of the
14 evidence is the least important in this case.  And Mr. George
15 has pled guilty (phonetic).  He intends to pursue that.  And --
16 and, finally, I think that overall, the Court can set
17 conditions that are reasonable.
18          Looking at the report this morning, the officer was
19 able to reach out to various members of the family.  His wife
20 said that she would be a surety.  The mother said that she
21 would be a surety.  Apparently, a brother is willing to be a
22 surety.  So the family certainly believes that Mr. George will
23 abide by conditions.
24          Given his strong family and community ties, we do
25 think that the Court could set reasonable conditions.  We would

1  ask the Court to do so.
2          THE COURT:  At this point, I am ordering that he be
3  held in custody, without bail.  I find there are no conditions
4  or combination of conditions that I could set that would
5  reasonably assure his appearance in court, as required.  And I
6  do that for the following reasons.
7          Initially, the defendant is facing a significant
8  amount of time in custody.  He was charged with a crime that
9  has a ten-year minimum mandatory, with a maximum of life in
10 prison.  That creates a very significant -- a concern that he's
11 facing a lot of time in custody.  That creates a risk that he's
12 going to flee.
13         I also am -- while the weight of the evidence is the
14 least important factor, in this case there's very strong
15 evidence supporting what it is the defendant is charged with.
16 And as part of that, this defendant has very significant ties
17 to Mexico.
18         He has -- based upon the evidence that's been
19 presented so far, he has made a significant amount of money in
20 cash.  It's unclear where that money is.  And he was leading
21 this separate life or secret life with frequent travel to
22 Mexico.  It indicates to me that he does have these ties in
23 Mexico that -- that he can access and then live a life down
24 there.
25         And while I certainly would not hold his mental

1  health situation against him, the fact that prison is difficult
2  for a man with his past employment and the crimes he's now
3  charged with, couple that with the fact that he's facing so
4  much time in custody, again, creates this very significant risk
5  that he is going to fail to appear in court as required; either
6  because he flees to Mexico or because he decides to take up
7  some other sort of drastic action.  And I don't believe there
8  are conditions that I could set that would change any of that.
9           Certainly a 20,000 bond is not sufficient.  And
10 coupled with that, with the fact that after this mental health
11 problem in May he didn't apparently do anything about that.
12 There's just so many factors here that create a risk that he
13 will not appear in court as required, will not comply with all
14 of my conditions.  And I -- I don't believe there are any
15 conditions that I can set that would modify that.
16           I do not find that he is a danger to the community.
17 I'm not finding it -- I'm not detaining him on that basis.  I'm
18 detaining him only on the risk of flight, failure to appear,
19 failure to comply with my conditions.
20           Government, if you will prepare an order.  Any
21 objection to the language, let me know.  Otherwise, I'll review
22 it.  All right?
23           Mr. George, your next court appearance is August 7th,
24 at 1:30 p.m., in Judge Robinson's courtroom.
25           That's it for today.

```
 1              ATTORNEY NIETOR:  Thank you.

 2              ATTORNEY CALDERON-PENALOZA:  Thank you, your Honor.

 3              THE COURT:  Thank you.

 4              (Pause.)

 5              UNIDENTIFIED SPEAKER:  (Indiscernible.)

 6              THE COURT:  Sir, you've got to go.

 7              (Conclusion of proceedings at 10:21 a.m.)

 8

 9                              --oOo--

10    I certify, by signing below, that the foregoing is a correct
      stenographic transcript, to the best of my ability, of the
11    digital recording of the audio proceedings had in the
      above-entitled matter this 13th day of January, 2024.  A
12    transcript without an original signature or conformed signature
      is not certified.  I further certify that the transcript fees
13    and format comply with those prescribed by the Court and the
      Judicial Conference of the United States.
14
                  /S/ Amanda M. LeGore
15                _____

16         AMANDA M. LeGORE, RDR, CRR, CRC, FCRR, CACSR 14290
```